## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                )
**KATELYN LUCIA, as administrator**             )
**of the estate of John W. Lucia,**             )
                                                )        **Civil Action No.**
        **Plaintiff,**                          )        **10-11228-FDS**
                                                )
        **v.**                                  )
                                                )
**CITY OF PEABODY; PEABODY POLICE**             )
**DEPARTMENT; MAYOR MICHAEL J.**                )
**BONFANTI; CHIEF ROBERT L.**                   )
**CHAMPAGNE; OFFICERS GREGORY**                 )
**PICKERING and RICHARD KENNEY, JR.;**          )
**LIEUTENANT SCOTT WLASUK; and**                )
**SERGEANT ARTHUR YEO, in their**               )
**individual and official capacities,**         )
                                                )
        **Defendants.**                         )
_____)


## MEMORANDUM AND ORDER ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

       This is a suit to recover damages for the allegedly wrongful death of John W. Lucia while

in the custody of the Peabody Police Department.  Plaintiff Katelyn Lucia is the decedent's

daughter and the administrator of his estate.  Defendants include the City of Peabody and its

mayor, as well as the Peabody Police Department, its chief, and four other individual officers.

       The complaint alleges claims under 42 U.S.C. § 1983 for violations of the Fourth, Fifth,

Eighth, and Fourteenth Amendments of the U.S. Constitution and claims of negligence and false

imprisonment under state law.  Defendants have now moved for summary judgment as to all

claims.  For the reasons set forth below, the Court will grant the motion.

I.       **Background**

A.       **Lucia's Death**

John W. Lucia was a chronic alcoholic who resided in Peabody, Massachusetts.  During the period of approximately twenty years before his death, the Peabody police officers responded to more than twenty documented instances involving Lucia's intoxication by alcohol.  The night of his death began with such an episode.

Around 10:00 p.m. on April 26, 2008, Officers Justin Cecil and Nancy Hart of the Peabody Police Department responded to a call about a disturbance on Lynnfield Street.  They observed two men, one of whom was Lucia, acting extremely intoxicated.  Cecil decided to take the individuals into protective custody.  Hart, who was familiar with Lucia, transported him to the station in her cruiser without placing him in handcuffs.

Upon arriving at the station, Lucia got out of the cruiser and was escorted to the booking area.  He was then partially booked by Officer Gregory Pickering before being given a blanket and led to a holding cell.  During the booking process, the officer-in-charge, Sergeant Arthur Yeo, observed that Lucia was unsteady on his feet and slow and lethargic in his movements, but nonetheless able to understand and communicate with the officers.  Sergeant Yeo was familiar with Lucia and knew that he had an alcohol problem, but did not know him to be a user of illegal drugs.  Yeo did not contact, and did not instruct any of the other officers to contact, a detoxification treatment facility in the area to determine if there was space available for Lucia.

Pickering did not complete the booking process when Lucia first arrived at the station, because there had been an influx of other arrestees.  When Pickering was ultimately ready to complete the booking of Lucia, he discovered that he had fallen asleep in his holding cell.

Pickering decided to let him be.

At midnight, Lieutenant Scott Wlasuk took over as the officer-in-charge and Officer Richard Kenney, Jr., took over as the booking officer. Yeo informed Wlasuk that Lucia was partially booked and in protective custody. During their shift, neither Wlasuk nor Kenney made an effort to determine the availability of a detoxification treatment facility for Lucia.

During the course of the night, officers Pickering and Kenney observed Lucia on a closed-circuit television and through an acrylic window during visual cell checks, which occurred every thirty minutes. The officers observed him sleeping, breathing, and snoring loudly, but made no attempt to wake him or communicate with him.[1]

Around 7:10 a.m. on April 27, Kenney entered Lucia's cell with the intention of releasing him from protective custody. Kenney observed, however, that Lucia was not breathing, was cold to the touch, and had a "blotchiness" to his face. Kenney immediately returned to the control room to call an ambulance.

Although an ambulance arrived at the station, and paramedics performed CPR, their efforts were not successful. Lucia was pronounced dead shortly thereafter.

An autopsy concluded the cause of Lucia's death was acute and chronic substance abuse—specifically, acute methadone intoxication, acute opiate intoxication, acute ethanol intoxication, and recent cocaine intoxication.

---

[1] A paragraph in plaintiff's Concise Statement of Material Facts asserts that snoring loudly can indicate dangerous levels of intoxication. That statement is based on the testimony of Dr. Michael Levy, Vice President of Clinical Services for the Center for Addictive Behaviors. Defendants have moved to strike the paragraph on the ground that it is based upon inadmissible opinion testimony. Because the Court can resolve the motion for summary judgment without deciding the issues presented in the motion to strike, it will deny the motion to strike as moot.

**B.**     **The Massachusetts Protective Custody Statute**

Massachusetts General Laws ch. 111B, § 8 gives police officers the authority to place

intoxicated individuals in protective custody.  It provides, in relevant part, as follows:

> Any person who is incapacitated may be assisted by a police officer with
> or without his consent to his residence, to a facility or to a police station. To
> determine for purposes of this chapter only, whether or not such person is
> intoxicated, the police officer may request the person to submit to reasonable tests
> of coordination, coherency of speech, and breath.
> . . .
> If any incapacitated person is assisted to a police station, the officer in
> charge or his designee shall notify forthwith the nearest facility that the person is
> being held in protective custody.  If suitable treatment services are available at a
> facility, the department shall thereupon arrange for the transportation of the
> person to the facility.
> . . .
> No person assisted to a police station pursuant to this section shall be held
> in protective custody against his will; provided, however, that if suitable
> treatment at a facility is not available, an incapacitated person may be held in
> protective custody at a police station until he is no longer incapacitated or for a
> period of not longer than twelve hours, whichever is shorter.

A "facility" is defined as "any public or private place, or portion thereof, providing

services especially designed for the detoxification of intoxicated persons or alcoholics."  Mass.

Gen. Laws ch. 111B, § 3.

**C.**     **The Peabody Police Department Policy and Internal Investigation**

Chapter 55.0 of the Peabody Police Department Manual concerns the lockup and holding

facility.  It states in part:  "[t]he Booking Officer or other assigned officer shall make a physical

check of the holding facility at least once every thirty minutes whenever there is a prisoner or

prisoners held.  Any prisoner having special or unusual circumstances of custody may have to be

checked more frequently or may require continuous monitoring.  Special attention should also be

paid to individuals who have apparent medical or physical difficulties."

4

Chapter 100.0 of the Manual is the department's Protective Custody Policy.  It is consistent with Mass. Gen Laws ch. 111B, § 8.  It limits the use of protective custody only to those individuals who are incapacitated from consuming alcohol (not drugs alone).  It further states in part:

> If the situation does not warrant an arrest, but action is necessary, a police officer has the authority to assist an incapacitated person, with or without his consent, to his residence, to a treatment facility, or to the police station.
> . . .
> If an incapacitated person is assisted to the police station, the Officer-in-Charge or his designee shall notify forthwith the nearest treatment facility that such person is being held under protective custody.  If suitable treatment services are available at a facility, the Massachusetts Department of Public Health shall thereupon arrange for the transportation of the person to the facility.
> . . .
> Nothing in these procedures shall be construed to require or permit a police officer to hold a person in protective custody against his will unless suitable treatment at a facility is not available.  If such treatment is not available, the person may be held in protective custody at the station for the following periods, whichever is shorter:  (a) up to twelve hours; or (b) until he is no longer incapacitated.
> . . .
> The Officer-in-Charge, or his designee, shall take every precaution to ensure that all persons held in protective custody are prevented from harming themselves in any way by carefully observing them at intervals of not more than thirty (30) minutes. A record shall be maintained of the time of such observations in accordance with departmental procedures.

The Police Department conducted an internal investigation into Lucia's death.  The investigation report ultimately found no fault by any of the officers or civilians employed by the Peabody Police Department, and no violations of the department's rules and regulations.[2]  However, in reviewing the report, Chief Champagne found that there was a "technical violation" of the rules and regulations for failure to make a telephone call to a treatment facility.  He

---

[2] The Massachusetts State Police also conducted an investigation into Lucia's death and concluded that the case should be closed.

ordered informal retraining to address the violation.

### D.       Center for Addictive Behaviors

The Center for Addictive Behaviors ("CAB") operates a treatment facility at 111 Middleton Road, Danvers, Massachusetts.  That facility is a detoxification facility that offers various services and programs.  The facility's staff includes a combination of registered nurses and licensed practical nurses.  The facility also employs a physician who is always on call.  The facility is open 24 hours a day, seven days a week to admit new patients.[3]

     If a patient consents to treatment and is admitted to the facility, the treatment that the patient would receive while he is still under the influence of alcohol would normally consist of observing the individual and waiting for his system to clear.  The staff also performs checks of such patients on an hourly basis.  If a patient's health or safety is determined to be at immediate risk, the nursing staff of the facility would call 911 for emergency services.

The record does not indicate whether the facility was full on the night of April 26, 2008.

## II.    Procedural History

On July 12, 2010, Katelyn Lucia, as administrator of the estate of John Lucia, initiated this action in the Superior Court of the Commonwealth of Massachusetts.  The complaint alleges claims under 42 U.S.C. § 1983 for violations of the Fourth, Fifth, Eighth, and Fourteenth

---

[3] Defendants have moved to strike various portions of plaintiff's Concise Statement of Material Facts concerning the operation of the CAB.  Among other things, defendants have moved to strike references to (1) the administration of prescription medications in CAB detoxification programs; (2) the frequency with which intoxicated individuals are admitted to the facility ("routinely," according to plaintiff); (3) the "continuous" nature of the treatment at the facility; and (4) the fact that nurses at the facility would look for specific signs of dangerous levels of intoxication, including "low blood pressure, slow pulse, slow respiration, heavy sleep, and heavy snoring."

     Defendant objects to these statements on the grounds that they are unsupported by the record and include inadmissible opinion testimony.  Again, because the Court can resolve the motion for summary judgment without deciding the issues presented in the motion to strike, it will deny the motion to strike as moot.

Amendments, and negligence and false imprisonment under Massachusetts law.  Defendants

removed the case to this Court on the basis of federal question jurisdiction.  Defendants have now

moved for summary judgment as to all claims.

### III.    Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822

(1st Cir. 1991) (internal quotation omitted).  Summary judgment is appropriate when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue of material fact and that the moving party is

entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is "one that

must be decided at trial because the evidence, viewed in the light most flattering to the

nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."

*Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  The Court must view

the entire record in the light most hospitable to the non-moving party and indulge all reasonable

inferences in that party's favor.  *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

### IV.    Analysis

#### A.    Section 1983 Claims

Plaintiff alleges claims under § 1983 for violations of the Fourth, Fifth, Eighth, and

Fourteenth Amendments.  However, it is well-established that constitutional claims arising out of

protective custody under Mass. Gen. Laws ch. 111B, § 8 should be analyzed under the Fourth

Amendment and the Due Process Clause of the Fourteenth Amendment.   *See Ringuette v. City of*

*Fall River*, 888 F.Supp. 258, 261 (D. Mass. 1995) ("the Fourth Amendment governs the seizure of

plaintiff taken into civil protective custody under Mass. G.L. ch. 111B, and . . . the substantive

due process clause of the Fourteenth Amendment governs the conditions of the protective

custody.").[4]  Accordingly, this Court will proceed under that framework.

### 1.        Alleged Constitutional Violations

Proof of plaintiff's § 1983 claims requires proof of a constitutional violation.  Plaintiff

does not contend that the initial decision to place Lucia in protective custody was

unconstitutional, or even contrary to Mass. Gen. Laws ch. 111B, § 8.  Instead, plaintiff contends

that holding Lucia without attempting to contact a treatment facility on his behalf violated his

Fourth Amendment right to be free from unreasonable seizure and his Fourteenth Amendment

substantive due process rights.  Plaintiff further contends that the failure to properly monitor and

care for Lucia while he was in custody also violated his Fourteenth Amendment substantive due

process rights.

### a.        Whether the Officers Violated Lucia's Constitutional Rights by Failing to Call a Treatment Facility and Holding Him Thereafter

It is uncontested that defendants failed to contact a treatment facility to inquire as to

whether space was available for Lucia.  It is also undisputed that their failure to do so violated

Mass. Gen. Laws ch. 111B, § 8 and police department policy.  In substance, plaintiff contends

that although the initial placement of Lucia into protective custody was lawful, it became

unlawful when the police failed to call a treatment facility and continued to hold him thereafter.

The first question is whether that action (or, more accurately, inaction) amounted to an

---

[4] *See also id. at 264,* quoting *Jones v. Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) (Posner, J.) ("At some point after a person is arrested, the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause (and after conviction to the Eighth Amendment's cruel and unusual punishment clause . . ." ).

unconstitutional seizure.

The First Circuit addressed a related set of issues in a case involving an individual who suffered severe injuries while in protective custody as a result of intoxication.  *Ringuette v. City of Fall River*, 146 F.3d 1, 5 (1st Cir. 1998).   As in this case, the police took Ringuette into protective custody under Mass. Gen. Laws ch. 111B, § 8.  As here, the police did not call the local treatment facility; the evidence suggested that such a call would have been fruitless, as there was likely no space available.[5]  Ringuette was held for approximately 12 hours, after which he was asked if he wanted to leave; at that point, he was still intoxicated, and told police, "I've got nowhere to go and I'm still half in the bag."   The police then "renewed" the 12-hour period of confinement, during which Ringuette suffered serious injury.

The dispute focused on the second detention period, which Ringuette contended was an unconstitutional seizure.  The First Circuit held that "while not every violation of a state statute bearing on detention would necessarily constitute an 'unreasonable' seizure under the Fourth Amendment . . . the statute's twelve-hour limitation on protective custody was intended as a fundamental limitation on state authority to detain Ringuette."  146 F.3d at 5.  Notably, the court did not address the question of whether the failure of the police to contact the facility rendered

---

[5]  The District Court's opinion stated as follows:

> The City proffers much undisputed evidence showing that the one detoxification facility in the area was not subject to municipal control, rarely had vacant beds available on short notice, generally had a wait list of seven days, and never maintained empty beds for police use.  Rita Bertoncini of the detoxification facility testified that the center "rarely had a bed available," but that the center does attempt to place patients in other facilities.  Moreover, if a bed is not available, a patient is placed on a wait list.  The undisputed testimony of Nancy Paull was that in the nine years in which she has been executive director she is "unaware of any occasion" in which a person was admitted to the detox program on the same day as the request.

*Ringuette*, 888 F.Supp. at 265-66.

further detention illegal under the statute; instead, it held that it became illegal when the twelve-hour period had passed.

Arguably, the First Circuit implicitly found that the period of detention between (1) the point at which the police should have called, but did not, and (2) the expiration of the twelve-hour cap on detention was not unconstitutional.[6]  That, however, does not necessarily resolve the issue. At the very least, the constitutional authority of the police to detain a person who has not been arrested for committing a crime, and in apparent violation of the state protective-custody statute, is open to question.

Complicating matters further is the fact that Lucia was both intoxicated and asleep at the point when the alleged violation began to occur (that is, the point at which the duty arose to call the treatment facility, which was at some point reasonably soon after he was detained).  There is no evidence that Lucia asked to be taken home, or for that matter protested his continued detention.  It is therefore doubtful that he was being held against his will.  Furthermore, it hardly seems sensible to conclude that the police—having failed to contact a treatment facility—became obligated at that point by the United States Constitution to arouse Lucia and put him back out on the street.[7]  Put another way, Lucia's continued detention was not entirely unreasonable under the

---

[6]  The issue had been raised in the District Court, albeit in a slightly different form.  *See Ringuette*, 888 F.Supp. at 265 ("Plaintiff does contend . . . that the defendants violated his Fourth Amendment rights by not taking reasonable steps to transport him home or to a facility.").  Although the District Court's opinion noted that "[t]he Fourth Amendment regulates the duration of confinement between the time of seizure and the time appropriate administrative steps incident to seizure are taken," citing *Gerstein v. Pugh*, 420 U.S. 103 (1975), it disposed of the matter on qualified immunity grounds.  *Id.*

[7]  As the First Circuit noted in *Ringuette*:

Ringuette was not a citizen demanding to be released from confinement.  He was, from all appearances, still drunk or otherwise incapacitated, and—according to the district court findings—he rebuffed two offers to release him, one made shortly before the end of the twelve-hour period and one made not long thereafter.  Nor did he later ask to leave.  The

circumstances.

Finally, it is a disputed issue of fact as to whether a suitable detoxification treatment facility was available to care for Lucia on the night in question.[8]  The record evidence includes no definitive answer as to question of whether CAB would have been able to admit Lucia.  Indeed, Dr. Michael Levy of the CAB testified in his deposition that he did not know what CAB's capacity was on that evening.  Dr. Levy also testified, however, that he had no recollection of any person who was being held in protective custody from *any* police department ever being admitted to CAB.  *Compare Ringuette*, 146 F.3d at 3 (noting that the center had not admitted anyone from the police station on short notice in the previous seven years.).  Sergeant Yeo testified that he would not have thought to call a treatment facility on behalf of Lucia because it was "common knowledge" that no beds were ever available.

Under the circumstances, the Court will defer resolving the difficult question of whether the police violated Lucia's Fourth Amendment rights, and will address instead the issue in the context of qualified immunity.

> **b.       Whether the Officers Violated Lucia's Constitutional Rights by Failing to Monitor Him and Provide Proper Care**

Plaintiff also contends that the officers' failure to monitor and provide proper care for Lucia violated his Fourteenth Amendment substantive due process rights.  Police "have a duty under the constitution to protect persons who are taken into protective custody because of

---

notion that police officers should simply have put Ringuette out on the street against his will in his then-apparent condition is implausible.

146 F.3d at 5.

[8] It is also disputed whether admission to such a facility would have prevented Lucia's death.

incapacitation and who lack the capacity to give knowing, intelligent and voluntary consent to protective custody." *Ringuett*e, 888 F. Supp. at 268. However, it is clearly established that § 1983 imposes liability for serious physical harm or death only where the defendant acts intentionally or with "deliberate indifference" to the deprivation of the victim's constitutional right. *Manarite v. City of Springfield*, 957 F.2d 953, 955 (1st Cir. 1992), citing use of "deliberate indifference" standard in *Wilson v. Seiter*, 111 S. Ct. 2321, 2323 (1991) (Eighth Amendment prison conditions); *Canton v. Harris*, 489 U.S. 378, 388-90 (1989) (Fourteenth Amendment municipal liability, police denial of medical treatment); *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976) (Eighth Amendment prison medical treatment).

When liability for death is at issue in a § 1983 action, "a plaintiff must demonstrate 'deliberate indifference' by showing (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case); (2) defendant's actual knowledge of (or, at least willful blindness to) that elevated risk; and (3) defendant's failure to take obvious steps to address that known, serious risk." *Manarite*, 957 F.2d at 956.

Here, it is undisputed that Lucia faced an unusually serious risk of harm due to the combination of alcohol, methadone, opiates, and cocaine that he ingested. Whether the officers actually knew (or were willfully blind to) that elevated risk is much less clear. It is uncontested that the officers did not know whether Lucia ingested drugs on the night in question—or, in fact, during any of the numerous interactions over the years between him and the police department. Plaintiff contends that the police were nonetheless willfully blind to the elevated risk. However, it is undisputed that the officers attempted to, and successfully did, communicate with Lucia; that he was able to understand them; and that he was able to move around under his own power. The

12

officers had observed many individuals, including Lucia himself on prior occasions, who were intoxicated by alcohol, but faced no unusually serious risk of death.  The officers concluded that Lucia was intoxicated by alcohol and treated him as such.

Again, rather than resolve the constitutional issue directly, the Court will defer on the question of whether the police failed to monitor and provide proper care for Lucia in violation of his Fourteenth Amendment rights, and will instead address the issue in the context of qualified immunity.

### 2.    Qualified Immunity of Individual Officers

Summary judgment in favor of the defendant officers as to the § 1983 claims may be warranted if the officers are entitled to qualified immunity.  The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Supreme Court has articulated a two-part test for determining qualified-immunity.  *Pearson v. Callahan*, 555 U.S. 223 (2009).  *See Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).  The relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct.  *Id.*

Although conducting this two-step analysis in sequence is sometimes advisable because doing so "promote[s] the development of constitutional precedent," courts have discretion to avoid the direct constitutional question when a matter may be resolved at the second step. *Maldonado*, 568 F.3d at 270.  For purposes of the second step of that analysis, whether the right

13

in question was "clearly established" depends on "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right."  *Mlodzinski v. Lewis*, 648 F.3d 24, 33 (1st Cir. 2011).

### a.        Claims Arising Out of Detention

As set forth above, the Fourth Amendment right in question is the right of a person not to be held in continued protective custody when a suitable treatment facility has not been sought, in violation of state law.  The first question under the qualified immunity inquiry is whether that right was clearly established in late April 2008, at the time of the relevant events.

The First Circuit's opinion in *Ringuette*, establishing that the twelve-hour limitation on protective custody was as a "fundamental limitation" on the constitutional authority to detain individuals in protective custody, preceded the officers' actions at issue here by ten years. *Ringuette*, 146 F.3d at 5.[9]  Ten years later, a reasonable police officer would certainly be expected to know that holding a person in protective custody, against his will, for longer than twelve hours violated both the Massachusetts statute and the Fourth Amendment.  However, as explained above, the court in *Ringuette* did not address whether the *statutory* obligation to call a treatment facility amounted to a *constitutional* prerequisite to protective custody detention.  Furthermore, it

---

[9] Furthermore, early in that case, another court in this district took up the issue of qualified immunity with respect the Fourth Amendment claim.  Though it was a close determination, that court awarded the officers the protection of qualified immunity, finding that although it was undisputed that a reasonable officer would have known that holding the individual for more than twelve hours was a violation of ch. 111B, "he would not necessarily have known that such a violation of Massachusetts law would amount to a deprivation of constitutional rights." *Ringuette v. City of Fall River*, 906 F. Supp. 55, 58 (D. Mass. 1995).  By its very terms, this reasoning applies only in the years before *Ringuette* was ultimately decided by the First Circuit.

was also well-established that it is reasonable under the Fourth Amendment to detain

arrestees—who are presumptively innocent—for up to 48 hours without a judicial hearing.

*Ringuette,* 888 F. Supp. at 265 (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975) (holding that the

Fourth Amendment generally requires a prompt judicial determination of probable cause

following an arrest made without a warrant and ensuing detention); *County of Riverside v.

McLaughlin*, 500 U.S. 44 (1991) (holding that "prompt" generally means within 48 hours of the

warrantless arrest).

Under the circumstances, a reasonable officer could have concluded that the Fourth

Amendment's primary restriction on protective custody was temporal, and that detaining an

individual in protective custody, for his own safety, for less than 12 hours would not violate the

Constitution.  At a minimum, if the Fourth Amendment requires otherwise, the "legal contours"

of that constitutional right were not then (and are not now) clearly established.  Accordingly, the

Court finds that a reasonable officer would not have known that determining that a suitable

treatment facility was not available was a Fourth Amendment prerequisite to his ability to

constitutionally detain an intoxicated individual who is not charged with any crime.

Furthermore, in the "particular factual context" of this case, a reasonable officer would not

have understood that his specific conduct violated the Constitution.  There is no evidence that

anyone who had been placed in protective custody of the Peabody Police Department due to

intoxication by alcohol had ever been accepted by a treatment facility.  It is further undisputed

that the Vice President of CAB did not know whether CAB had ever admitted a patient directly

from the protective custody of *any* police department.  Plaintiff has produced no specific evidence

concerning the availability of a treatment facility on the night in question or whether a reasonable

15

officer would have known which facility that was.  Under the circumstances, a reasonable officer could have concluded that there were no beds available, without making the call, and would not have concluded that simply neglecting to make the call would lead to a constitutional violation.

### b. Claims Arising Out of Alleged Failure to Provide Care

In *Ringuette*, the district court correctly held that the police "have a duty under the constitution to protect persons who are taken into protective custody because of incapacitation and who lack the capacity to give knowing, intelligent and voluntary consent to protective custody." 888 F.Supp. at 268.  However, it is clearly established that § 1983 imposes liability for serious physical harm or death only where the defendant acts intentionally or with "deliberate indifference" to the deprivation of the victim's constitutional right.  *Manarite v. City of Springfield*, 957 F.2d 953, 955 (1st Cir. 1992).

Again, the relevant inquiry for the purposes of qualified immunity is whether, "in the particular context of the case," a reasonable officer would have understood that his conduct violated Lucia's constitutional rights.  As noted above, the officers knew that Lucia was a chronic alcoholic, and the police department had encountered him on multiple occasions in the past when he was inebriated by alcohol.  The officers did not know on the night of April 26 that he had also ingested drugs, including opiates, which substantially increased the level of danger he presented to himself.  There is no evidence in the record that he presented unusual symptoms (that is, symptoms different from or inconsistent with alcohol intoxication) or expressed unusual distress.  And there is no evidence that the police found drug paraphernalia, or had some other reason to believe drugs were involved.  The officers assumed, not unreasonably, that he was drunk and

needed to sleep it off.[10]

In short, a reasonable police officer under the circumstances presented here would not have understood that his conduct violated Lucia's constitutional right to proper monitoring and care while incarcerated.  Accordingly, the Court finds that Officer Pickering, Officer Kenney, Lieutenant Wlasuk, and Sergeant Yeo are entitled to qualified immunity and will grant them summary judgment on the plaintiff's § 1983 claims on that basis.

### 3.        Claims Against the Municipality

Plaintiff further contends that the City of Peabody, the Peabody Police Department, Mayor Michael Bonfanti, and Police Chief Robert L. Champagne are liable under § 1983 for engaging in a custom and practice of failing to follow Mass. Gen. Laws ch. 111B, § 8, and failing to train the members of the Peabody Police Department on the statute.

As a preliminary matter, it is uncontested that the City of Peabody and the Peabody Police Department are municipal entities subject to potential liability under § 1983.  It is also uncontested that Mayor Bonfanti and Chief Champagne are municipal officials with "final policymaking authority." *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986).

To establish municipal liability, a plaintiff must show that "the municipality *itself* causes the constitutional violation at issue.  *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *Monell v. Department of Soc.*

---

[10] It also bears mentioning that Lucia himself had created the situation, by ingesting multiple substances to the point of dangerous intoxication.  He alone knew exactly what he had ingested.  As noted, despite his intoxication, he was able to communicate with the police during the arrest and initial booking stages; there is no evidence that he said anything to the police about what drugs he had taken.

*Servs.*, 436 U.S. 658, 694-95 (1978).[11]  Thus, the plaintiff is required to demonstrate both the existence of a policy or custom and a "direct causal link" between that policy and the alleged constitutional deprivation.  *Harris*, 489 U.S. at 385; *see also Monell*, 436 U.S. at 694 (policy must be the "moving force [behind] the constitutional violation"); *Santiago v. Fenton*, 891 F.2d at 373, 381-82.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).

The claim for municipal liability rests principally on the city's alleged failure to train, supervise, and discipline its police officers.  A claim against a municipality under § 1983 is "most tenuous where [it] turns on a failure to train."  *Id.* at 1359.  To give rise to liability in such an action, "a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  *Id.* (quoting *Canton*, 489 U.S., at 388).  *See also Young v. City of Providence*, 404 F.3d 4, 26-27 (1st Cir. 2005) (holding that, under *Monell*, "any proper allegation of failure to train . . . must allege that [the officer's] lack of training caused him to take actions that were objectively unreasonable and constituted excessive force" and that "the identified deficiency in [the training program was] closely related to the ultimate injury.").

As evidence of the alleged failure to train officers to call treatment facilities on behalf of persons in protective custody, plaintiff points to two pieces of evidence.  First, Chief Champagne testified that he did know whether or not a copy of ch. 111B, § 8 was provided to officers as part of their training.  Second, Sergeant Yeo testified that he had never received in-service training on

---

[11] For the purposes of this analysis, the City of Peabody and the Peabody Police Department both constitute the "municipality" of Peabody.

the protective-custody statute.  However, the record also includes the department's Protective

Custody Policy, which is included in the department manual.  That policy comports with ch.

111B, § 8, and, in particular, requires officers to contact treatment facilities to inquire as to

whether they have space for any intoxicated individual taken into protective custody and brought

to the station.  Not only is that policy included in the department's manual, officers have access to

the statute itself electronically.

The bar for establishing "deliberate indifference" in connection with a failure-to-train

claim is quite high, and plaintiff does not meet it here.  The official policy of the department

required the officers to call a treatment facility, and officers were provided a copy of that policy

in their department manuals.  Such a method of training, while perhaps not an ideal practice, does

not constitute deliberate indifference to the constitutional rights of those in protective custody.

*See, e.g., Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001) (finding that although

"police officers received no formal training specifically directed [to the situation at issue], they

did have the guidance of the policy manual, and we believe a reasonable trier of fact could not

conclude that the need for further guidance was so obvious as to indicate deliberate

indifference"); *Nance v. Griffin*, 1991 U.S. App. LEXIS 15036 (6th Cir. 1991) (finding that "a

negligent deviation from the clear directive" did not amount to deliberate indifference); *Burns v.

Galveston*, 905 F.2d 100, 104 (5th Cir. 1990) (finding no deliberate indifference where training

on suicide prevention consisted only of requiring the officers to "read and familiarize themselves

with the revised manual").

Plaintiff also contends that the customary practice of the department ran directly

contradictory to its written policy.  As support for this proposition, plaintiff points to the

19

testimony of Chief Champagne, Sergeant Yeo, and CAB Vice President Levy.  All three testified

that they were not aware of any individual ever being admitted to a treatment facility from

protective custody in the Peabody Police Department.  However, Chief Champagne and Sergeant

Yeo also testified that, in their experience, their have never been any beds available at the

detoxification treatment facilities.  Chief Champagne testified that he believed that his officers

nonetheless called the facilities each time a person was brought into protective custody.  Sergeant

Yeo testified that because it was "common knowledge" that no beds were ever available, it

"wasn't paramount in [his] mind" to call a detoxification facility on the night in question.  He also

testified that placing individuals in protective custody in the holding cell, rather than a

detoxification facility, was the "common practice."  However, even if most of the officers of the

Peabody Police Department followed that practice most of the time, such a practice is not

necessarily the official policy of the municipality with the "force of law."  *Connick v. Thompson*,

131 S.Ct. 1350, 1359 (2011).  It is undisputed that the policymakers' instructions and the official

policy of the department were to have the officers call treatment facilities, and there is nothing in

the record that could lead a reasonable juror to conclude that the failure to make such calls was

"so persistent and widespread as to practically have the force of law."  *Id.* at 1359.

Accordingly, the Court will grant summary judgment in favor of the City of Peabody and

the Peabody Police Department on the plaintiff's § 1983 claims.

### 4.    <u>Claims Against Mayor Bonfanti and Chief Champagne</u>

The Court interprets plaintiff's claims against Mayor Bonfanti and Chief Champagne to be

based on a theory of supervisory liability, as neither person was directly involved with the

incidents in question involving Lucia.[12]

Like liability for the municipality itself, supervisory liability under § 1983 cannot be predicated on a *respondeat superior* theory. *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 48 (1st Cir. 1999). *See also Monell*, 436 U.S. at 691 (1978). Rather, any liability incurred by a supervisor must be "on the basis of his own acts or omissions." *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994). Supervisory liability for alleged constitutional deprivations attaches only if the supervisor is a "primary violator or direct participant in the rights-violating incident" or "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)).

There is nothing in the record to suggest that either Mayor Bonfanti or Chief Champagne acted with "deliberate indifference" in supervising the officers who neglected to call a treatment facility on the night in question.[13] Chief Champagne testified that he, in fact, believed that his officers followed the department's policy and made calls to treatment facilities despite the common knowledge that beds were rarely, if ever, available. Furthermore, it is undisputed that after Lucia's death, Chief Champagne ordered an internal investigation. Although the investigation did not find fault on the part of the officers, Chief Champagne nonetheless determined that a violation of department policy had occurred and ordered that further training

---

[12] To the extent that plaintiff's claims against Mayor Bonfanti and Chief Champagne are based on their roles as officials with "final policymaking authority," the Court will grant summary judgment as to those claims, in light of the failure of the claim against the municipality. *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986).

[13] The plaintiff makes no claim on the basis of the hiring decisions of the mayor or the chief. Consequently, the Court will confine its analysis to the supervising and training prongs.

21

take place.  Under the circumstances, no reasonable jury could conclude that Chief Champagne acted with "deliberate indifference" in supervising the officers under his command.  As to Mayor Bonfanti, there is no evidence that suggests he had any involvement in supervising the defendant officers at all, let alone as to the protective-custody policy.  Accordingly, the Court finds that no reasonable jury could conclude that Mayor Bonfanti acted with "deliberate indifference" in supervising those under his command.

To the extent that the plaintiff's claims against Mayor Bonfanti and Chief Champagne are based on their failure to train the officers involved, the Court finds that they did not act with "deliberate indifference" for substantially the same reasons articulated above with respect to the failure-to-train claim against the municipality.

Accordingly, the Court will grant summary judgment to Mayor Bonfanti and Chief Champagne on the plaintiff's § 1983 claims.

### B.       State-Law Tort Claims

#### 1.       Negligence

Plaintiff contends that the City of Peabody and the Peabody Police Department acted negligently towards Lucia.  Specifically, plaintiff contends the department is liable for the negligence of its officers in not calling a treatment facility and in not providing a reasonable level of care to him while he was detained.  Plaintiff further contends that city is liable for the negligence of its employees in the training of the defendant officers.

The Massachusetts Tort Claims Act provides that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment."

Mass. Gen. Laws ch. 258, § 2 (2005); *see also Spring v. Geriatric Auth. of Holyoke*, 394 Mass.

274, 283, 285 (1985) (noting that the MTCA effectively removes the defense of immunity in

certain tort actions against public employers).[14]

Defendants contend that the negligence claim is barred by section 10(j) of the MTCA.

That section provides that a public employer cannot be liable for

> any claim based on an act or failure to act to prevent or diminish the harmful
> consequences of a condition or situation, including the violent or tortious conduct
> of a third person, which is not originally caused by the public employer or any
> other person acting on behalf of the public employer.

Mass. Gen. Laws. ch. 258 § 10(j).  It is undisputed that the department's actions were not the

"original cause" of the harm to Lucia.

Plaintiff seems to rely on the exception to the above provision provided by § 10(j)(1),

which excludes

> any claim based upon explicit and specific assurances of safety or assistance,
> beyond general representations that investigation or assistance will be or has been
> undertaken, made to the direct victim or a member of his family or household by a
> public employee, provided that the injury resulted in part from reliance on those
> assurances.  A permit, certificate or report of findings of an investigation or
> inspection shall not constitute such assurances of safety or assistance.

Mass. Gen. Laws. ch. 258 § 10(j)(1).  There is no evidence in the record, however, that any

officer made any "explicit and specific assurances of safety or assistance."  Even assuming that

the decision to take him into protective custody could be deemed such an "assurance," there is no

evidence that Lucia's injury resulted in part from "reliance on those assurances."  Neither Lucia,

---

[14] There is no dispute that the City of Peabody and the Peabody Police Department were public employers. A condition precedent to bringing suit against a public employer under the statute is the presentment of a claim "in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose."  Mass. Gen. Laws ch. 258 § 4.  Here, it appears to be undisputed that plaintiff made such a presentment on September 23, 2009.

nor any family member, failed to seek medical care in reliance on the fact that the Peabody police were going to arrange for the necessary care.  As a result, the City fo Peabody and the Peabody Police Department are immune from negligence liability pursuant to the statutory exclusion of Mass. Gen. Laws. ch. 258 § 10(j)**.**

Accordingly, the Court will grant summary judgment to the City of Peabody and the Peabody Police Department on the plaintiff's negligence claims.

### 2.      **False Imprisonment**

Plaintiff contends that the defendant officers are liable for the tort of false imprisonment for the continued confinement of Lucia without calling a treatment facility as required by the statute and department policy.  Again, plaintiff does not dispute that the officers' initial placement of Lucia into protective custody was lawful.

Under Massachusetts law, the tort of "[f]alse imprisonment consists of '(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement.'"  *Sietins v. Joseph*, 238 F. Supp. 2d 366, 381 (D. Mass. 2003) (quoting *Ball v. Wal-Mart*, 102 F. Supp. 2d 44, 55 (D. Mass. 2000)). Police officers are subject to liability for false imprisonment "unless the police officer had a legal justification" for the restraint.  *Rose v. Town of Concord,* 971 F. Supp. 47, 51 (D. Mass. 1997) (citing *Wax v. McGrath*, 255 Mass. 340, 342 (1926)).  Plaintiff concedes that the officers had a legal justification for initially placing Lucia in protective custody, but nonetheless contends that the officers' continued holding of Lucia, without calling a treatment facility, amounted to false imprisonment under Massachusetts law.

Massachusetts courts have cited approvingly the Restatement (Second) of Torts when

interpreting the elements of the tort of false imprisonment.  *See, e.g., Sarvis v. Boston Safe Deposit & Trust Co.*, 47 Mass. App. Ct. 86, 98 (Mass. App. Ct. 1999).  As to the element of intent, the Restatement (Second) of Torts § 37 (1965) provides that "If an act is done with *the intent to confine another*, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement."  There is no evidence to suggest that the defendant officers decided not to call a treatment facility with the intent to confine Lucia.  Indeed, the undisputed record evidence suggests that, at least with respect to Sergeant Yeo, the motivation behind the failure to call a treatment facility, to the extent that it was a conscious decision at all, was the "common knowledge" that such a facility would not have space for Lucia.  The Court finds that no reasonable juror could conclude, on the basis of that evidence, that the defendant officers neglected not to call a treatment facility with the intent to confine Lucia.

Accordingly, the Court will grant summary judgment to Officer Gregory Pickering, Officer Richard Kenney, Jr., Lieutenant Scott Wlasuk, and Sergeant Arthur Yeo on the plaintiff's claim of false imprisonment.

**V.**     **Conclusion**

For the reasons set forth herein defendants' motion for summary judgment is GRANTED.

**So Ordered.**


                                                    /s/ F. Dennis Saylor
                                                    F. Dennis Saylor IV
Dated:  January 30, 2013                            United States District Judge